IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LANDIS W. WRIGHT,<br>              Plaintiff | :<br>: |
| | : NO. |
|              v. | :<br>: |
| | : |
| SHARON E. TAYLOR, in her | : |
| individual and official capacities | : |
| as set forth in this Complaint, | : |
| ANTHONY ("ROCKY") J. BONOMO, | : |
| in his individual and official capacities | : |
| as set forth in this Complaint, | : |
| and KEITH T. MILLER, in his | : |
| individual and official capacities | : |
| as set forth in this Complaint, | : |
|              Defendants | : ELECTRONICALLY FILED |

## **COMPLAINT**

### **Jurisdiction and Venue**

1.     This Court has jurisdiction over Plaintiff's claims pursuant to 28

U.S.C. §§ 1331, 1343, 1367 as well as 42 U.S.C. § 1983.

2.     Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(b)

inasmuch as all Defendants reside in Pennsylvania and reside in this judicial

district and because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

## The Parties

3.      Plaintiff Landis W. Wright is a twenty-one-year-old student at Lock Haven University ("Lock Haven") and who is also a citizen and resident of Lock Haven, Pennsylvania.

4.      Defendant Sharon E. Taylor ("Ms. Taylor") is an adult individual who maintains her usual place of business at Lock Haven.  At all times relevant hereto, Ms. Taylor has been employed by Lock Haven as the Director of Athletics, among other capacities.  Plaintiff sues Ms. Taylor in her individual capacity with respect to all relief requested in this Complaint and in her official capacity for all relief of an injunctive nature as set forth in this Complaint.

5.      Defendant Anthony ("Rocky") J. Bonomo ("Mr. Bonomo") is an adult individual who maintains his usual place of business at Lock Haven.  At all times relevant hereto, Mr. Bonomo has been employed by Lock Haven as Head Wrestling Coach.  Plaintiff sues Mr. Bonomo in his individual capacity with respect to all relief requested in this Complaint and in his official capacity for all relief of an injunctive nature as set forth in this Complaint.

6.      At all times relevant to the averments of this Complaint, Dr. Keith T. Miller ("Dr. Miller") was an adult individual who maintains his usual place of

2

business at Lock Haven. Dr. Miller is sued in his individual capacity with respect to all relief requested in this Complaint and in his official capacity for all relief of an injunctive nature as set forth in this Complaint.

7.     At all times relevant to the averments of this Complaint, Dr. Miller has been employed by Lock Haven as the President of the University.

8.     At all times relevant to the averments of this Complaint, Dr. Miller had supervisory authority over Ms. Taylor and Mr. Bonomo.

### Facts

**A.     Recruitment of Landis Wright by Lock Haven**

9.     As a student at Bald Eagle Area High School ("BEA") in Wingate, Pennsylvania, Landis Wright was recognized as one of the nation's most promising young wrestlers. While a member of the school's wrestling team, Landis earned a host of wrestling honors, including recognition as a double Junior National All-American, being named district champion twice, placing third in the 2005 PIAA Championships and scoring over one hundred (100) career wins. As a senior at BEA, Landis was ranked seventh in the nation and third in Pennsylvania.

10 .    In choosing a college, Landis and his parents looked for an institution that would enable him to meet both his academic and athletic goals. They also sought a school that would give Landis the opportunity to wrestle for a nationally recognized team and potentially pave the way for a coaching career.

11.     As the head coach of the Lock Haven men's wrestling team, Mr. Bonomo was at all times relevant hereto authorized by Lock Haven to recruit and select members of the team, and to recommend that Lock Haven offer recruits and team members financial aid.

12.     While Landis was in high school, representatives of Lock Haven, including Mr. Bonomo, vigorously and aggressively recruited Landis to attend Lock Haven and to wrestle with Lock Haven's men's wrestling team.

13.     Landis was sought by various top-ranked wrestling schools in the nation and could have wrestled for another university's wrestling team and obtained a scholarship.

14.     To entice Landis to attend Lock Haven and participate as a member of the wrestling team, Mr. Bonomo offered Landis a $10,000 per year athletic scholarship for up to five years.

15.     During Mr. Bonomo's recruitment of Landis, Mr. Bonomo was advised by Landis and his family that they would consider attending Lock Haven if Landis was permitted to lift and train according to his own regime.

16.     During Mr. Bonomo's recruitment of Landis, Mr. Bonomo gave Landis a choice between wrestling in a 165-pound weight class and a 174-pound weight class.  Landis told Mr. Bonomo that he would wrestle in a 174-pound weight class.

4

17.    During Mr. Bonomo's recruitment of Landis, Landis and his parents advised Mr. Bonomo of Landis' reading disability which required Landis to take additional time and on some occasions to seek additional help in understanding printed text.

18.    During Mr. Bonomo's recruitment of Landis, Mr. Bonomo also offered Landis' younger brother, Quentin Wright, a full scholarship to wrestle at Lock Haven.  Because Quentin was only a sophomore in high school at this time, the recruitment approach by Mr. Bonomo regarding Quentin was in violation of NCAA rules.  Landis' father, Paul Wright, did not respond to Mr. Bonomo's offer because he knew the offer violated NCAA rules.

19.    In convincing Landis to choose Lock Haven, Mr. Bonomo represented to Landis and his parents that if Landis wrestled for Lock Haven, Landis could wrestle for a total of five (5) years (with one year as a red-shirt), wrestle in a weight class selected by Landis, and lift according to Landis' own workout regime. Mr. Bonomo also represented to Landis and his parents that Landis would receive the extra attention he needed in order to succeed academically at Lock Haven.

**B.      Landis Wright's Decision to Attend Lock Haven**

20.      After narrowing his decision down to approximately four (4) colleges and universities, Landis chose Lock Haven, in large part because of the representations of Mr. Bonomo discussed above.

21.      On information and belief, Ms. Taylor was aware of the discussions between Mr. Bonomo and Landis.

22.      On November 9, 2005, on Mr. Bonomo's recommendation and Ms. Taylor's authorization in her capacity as Athletic Director for Lock Haven, Lock Haven offered Landis a $10,000 scholarship to attend Lock Haven and the opportunity to wrestle for the school's men's wrestling team for five years.

23.      Lock Haven asked Landis and his parents, Paul and Nola Wright, to sign a National Letter of Intent ("NLI"), committing Landis to wrestle only for Lock Haven.  Landis and his mother, Nola, signed the NLI on November 14, 2005, which was countersigned by Ms. Taylor in her capacity as Athletic Director, on behalf of Lock Haven.

24.      Landis was accepted for admission to Lock Haven as a full-time undergraduate student, and entered the University in the fall of 2006.

### C.   Landis Wright's Freshman Year at Lock Haven

25.   During his freshman year at Lock Haven, Landis participated as a member of Lock Haven's wrestling team.  Landis was one of six wrestlers in the nation to be named All-American at the University National Championships which qualified Landis to train at the Olympic Training Center.  Landis also finished third at the Pennsylvania State Athletic Conference and placed fifth at the Eastern Wrestling League Tournament.  Landis finished his freshman season with an official record of twenty-four wins and twelve losses.

26.   Lock Haven honored Landis for his strong freshman year by presenting him with the Dennis Killion Award for the team's most improved wrestler.  Lock Haven also honored Landis by selecting Landis to participate in an international wrestling trip during the summer after his freshman year.

27.   In the spring of 2007, Landis signed new scholarship papers for the 2007-2008 school year.  Mr. Bonomo initiated the process for preparing the papers, inviting Landis to his office to sign them and responding to Landis' questions relating to the papers.

### D.   Landis Wright's January 26, 2008 Injury

28.   On Saturday, January 26, 2008, Landis seriously injured his shoulder during a wrestling match.

29.    After the match, Lock Haven's trainer, with Mr. Bonomo's knowledge and encouragement, applied ice to Landis' injured shoulder. Landis was told his shoulder would be examined two (2) days later.

30.    Later that night, Landis experienced such excruciating pain that his father, Paul Wright, took Landis to Mount Nittany Medical Center's Emergency Room where a physician took x-rays of Landis' shoulder and despite the inaccurate and dangerous diagnosis by the team trainer, diagnosed Landis with a separated shoulder and advised Landis to follow-up with other medical care.

31.    The emergency room physician who examined Landis instructed Landis not to wrestle or participate in any type of sport for several weeks and informed Landis that he would need at least four to six weeks rehabilitation after his shoulder healed.

32.    Subsequently, Landis visited a specialist at the University Orthopedic Center. An orthopedic surgeon confirmed the prior x-ray diagnosis and advised Landis that his shoulder was still damaged and that it was not reasonable for Landis to resume wrestling without at least four to six weeks of rehabilitation. The surgeon advised Landis that if he did not follow instructions, he could risk permanent injury to his shoulder and never wrestle again.

33.    On January 28, 2008, Landis returned to school and reported to Mr. Bonomo and the team trainer what the doctor had told him over the weekend in the

8

emergency room. Mr. Bonomo requested that Landis bring him the x-rays of his shoulder so the team trainer could examine them.

34.     Upon seeing the x-rays of Landis' shoulder, the team trainer told Landis that he would try to have Landis ready to wrestle within three weeks in the upcoming February 15, 2008 match against Lock Haven's rival, Bloomsburg University ("Bloomsburg").

35.     Thereafter, despite Landis' shoulder injury, Mr. Bonomo pressed Landis to wrestle during practices. Landis followed Mr. Bonomo's orders and practiced with one arm in order to prepare for the match against Bloomsburg.

36.     At the time, Landis' arm movement was substantially restricted; he had seen no improvement since the date of the injury.

37.     The team trainer also offered to administer an injection to Landis of an unspecified drug before the Bloomsburg match that would numb his shoulder and help Landis wrestle through the pain. Landis refused to accept the injection.

38.     Mr. Bonomo pressured Landis to wrestle in the match against Bloomsburg and Mr. Bonomo took actions which encouraged other members of the wrestling team to pressure Landis to wrestle in that match.

39.     When Landis voiced concerns over jeopardizing his wrestling career for one wrestling match, Mr. Bonomo informed Landis that Landis had to do what

the coach told him to do and that Landis would have to live with the coach's decision.

40.     Thereafter, Landis advised his father, Paul Wright, that he needed help and did not want to wrestle in the February 15, 2008 match against Bloomsburg due to his shoulder injury.

### E.     Landis Wright's February 12, 2008 Meeting

41.     Because of Landis' concern, which was shared by his father, Landis and his father requested a meeting with Ms. Taylor in her capacity as Athletic Director.  A meeting was scheduled with Ms. Taylor for February 12, 2008.

42.     At the meeting scheduled on February 12, 2008, Landis and Paul Wright intended to raise questions about Mr. Bonomo's efforts to pressure Landis to wrestle in the Bloomsburg match.

43.     When Landis and his father arrived at the meeting, there were six people from the University present, including the coach, assistant coach, athletic director, assistant athletic director, the team's trainer, and the team's weightlifting coach.  The attendance of so many additional people caused Landis and Paul to feel pressured by Lock Haven and its athletic staff.

44.     At the beginning of the meeting, the Wrights expressed concerns regarding the pressure by Mr. Bonomo to make Landis wrestle in the upcoming

match against Bloomsburg. The Wrights made statements objecting to Lock Haven's practice of attempting to force athletes to play even when injured.

45.     During the meeting, an exchange occurred between the Wrights and others present, particularly Mr. Bonomo, over whether Landis received appropriate medical attention on January 26, 2008 and whether Landis should wrestle with his shoulder injury.

46.     During the exchange, the Wrights raised their knowledge and beliefs that NCAA violations were occurring at Lock Haven with respect to the men's wrestling team, including excessive weight loss, impermeable sweat suits, steam rooms and pushing injured athletes to wrestle.

47.     During the meeting, Mr. Bonomo told Paul Wright that he should take Landis out of the wrestling program.

48.     During the meeting, Ms. Taylor told Landis he could have his scholarship at Lock Haven if Landis would sit in the bleachers and keep quiet. Ms. Taylor stated that it would be worth the money not to have any more meetings raising issues like the meeting they were having on February 12, 2008.

**F.**     **Events Following the February 12, 2008 Meeting**

49.     After the meeting, Landis took his concerns to Dr. Roger Johnson, the Provost at Lock Haven.

50.     Despite difficulties in securing a meeting with Dr. Johnson, Landis was able to meet with him in his capacity as Provost on February 26, 2008.

51.     During the meeting with Dr. Johnson, Landis raised issues with Dr. Johnson concerning his own situation involving pressure by Mr. Bonomo to wrestle while injured and also raised issues relating to practices in the wrestling program which would constitute NCAA violations.  Issues raised with Dr. Johnson were similar to issues raised in the February 12, 2008 meeting with Ms. Taylor and Mr. Bonomo.

52.     During the meeting with Dr. Johnson, Landis also expressed concern that Ms. Taylor and Mr. Bonomo would retaliate against Landis for raising issues discussed at the February 12, 2008 meeting as well as those raised with Dr. Johnson.

53.     On March 4, 2008, Landis indicated to Dr. Johnson that he wanted his concerns expressed during their February 26, 2008 meeting to be considered a formal complaint.

54.     Prior to the meetings on February 12, 2008, February 26, 2008, and March 4, 2008, Landis was a valued member of the wrestling team, as evidenced by Mr. Bonomo's efforts to force him to wrestle even when injured.

55.     After the meetings on February 12, 2008, February 26, 2008, and March 4, 2008, and following statements of Mr. Bonomo and Ms. Taylor at the meeting of February 12, 2008, Landis was subjected to continuous and unrelenting efforts by Ms. Taylor and Mr. Bonomo to force him out of the athletic program.

56.     During the period February - March 2008, Dr. Miller, in his capacity as President of Lock Haven, became aware of the events involving Landis and of the statements of concern which Landis had raised with Dr. Johnson, Ms. Taylor and Mr. Bonomo.

57.     Specifically, Dr. Miller represented, *inter alia*, that substantial efforts would be undertaken to improve communications between Mr. Bonomo and Landis.

58.     In addition, Dr. Miller assured Landis that he did not need to fear retaliation because Dr. Miller would take care of Landis.

59.     Despite his knowledge of the events relating to Landis and of Landis' statements of concern, Dr. Miller failed to remedy and acquiesced in the actions of Ms. Taylor and Mr. Bonomo.

**G.** **Lock Haven's So-Called "Investigation"**

60. On April 16, 2008, Dr. Miller wrote to Landis and his father advising them that an investigation would be conducted regarding Landis' formal complaint.

61. Despite Dr. Miller's assurances that an investigation of Landis' complaints of NCAA violations would be conducted, Ms. Taylor and Mr. Bonomo never undertook an objective, meaningful and fair investigation.

62. Contrary to assurances of Dr. Miller with respect to an investigation, Ms. Taylor and Mr. Bonomo undertook actions which not only failed to investigate but had the effect of covering up the violations raised by Landis. Specifically, these actions which precluded an objective conclusion consisted of, among others, the following:

    a. Ms. Taylor conducted the so-called "investigation" even though Ms. Taylor was part of the February 12, 2008 meeting at which time she led Landis and his father to believe that she was prepared to provide financial aid to Landis if he would quietly "sit in the bleachers."

    b. The so-called "investigation" was undertaken by interviewing members of the wrestling team, two at a time, which had

the effect of discouraging team members from being candid and telling what they truthfully knew to be the facts.

      c.    The so-called "investigation" was conducted in a way that allowed a team member who was interviewed to communicate questions and responses from an interviewed team member to team members not yet interviewed.

      d.    On information and belief, members of the athletic staff of Lock Haven communicated suggested answers to interview questions to team members before the interviews.

63.    Not surprisingly, the results of the so-called "investigation" failed to determine the accuracy of the practices in the wrestling program.

**H.**    **Retaliation Against Landis Wright**

64.    Following the February 12, 2008, February 26, 2008, and March 4, 2008 meetings and the so-called "investigation," Landis was subjected to an ongoing and continuing series of actions designed to force him out of the wrestling program at Lock Haven and to deprive him of his scholarship. Specifically:

      a.    The retaliation against Landis consisted of actions to preclude his participation in the wrestling program at Lock Haven and to deprive him of his scholarship by making difficult or impossible his

actions needed to enroll Landis and continue his participation in the wrestling program.

b.     Following the meetings of February 12, 2008, February 26, 2008, and March 4, 2008, Ms. Taylor and Mr. Bonomo undertook specific actions at each stage of the process used to continue participation in the wrestling program and its related scholarship program to discourage or bar Landis from continuing in the wrestling program and receiving his scholarship.

c.     Landis was subjected to exclusion from team communications and was made the target of derogatory statements and sentiments by team members which were in part instigated by and/or done with the knowledge and acquiescence of Mr. Bonomo.

d.     In the period April-May 2008, Mr. Bonomo made contact for Landis difficult in order for Landis to acquire renewal scholarship forms for the 2008-2009 school year.

e.     In the period May-August, 2008, Ms. Taylor and Mr. Bonomo communicated with Landis in a way which confused Landis in terms of expectations relating to paperwork and then used paperwork as a reason for attempting to preclude Landis from participating in the wrestling program.

f.      Ms. Taylor and Mr. Bonomo refused to accept Landis'
team paperwork despite the fact that Landis had signed it, claiming a
notation on some of the papers by Landis' father made the papers
unacceptable.

g.      On September 9, 2008, Mr. Bonomo informed Landis
that he was not on the wrestling team and asked him to withdraw from
the team practice room.  On September 14, 2008, however, Mr.
Bonomo denied that he told Landis that he was not on the wrestling
team.

h.      On September 22, 2008, Mr. Bonomo and Ms. Taylor
published Lock Haven's wrestling roster and deleted Landis' name
from the roster.

i.      Ms. Taylor and Mr. Bonomo effectively caused Landis'
athletic scholarship to be removed from him.  Initially, Ms. Taylor and
Mr. Bonomo perfunctorily removed Landis' scholarship.  When
challenged, Dr. Miller caused Landis' tuition bills to be paid but he
did not restore Landis' athletic scholarship.  Ms. Taylor and Mr.
Bonomo then refused to extend any scholarship for the 2009-2010
year, in which Dr. Miller acquiesced.

j.      Not until March 2009 did Lock Haven accord Landis a hearing with respect to the removal of his scholarship.

k.      Mr. Bonomo has made public statements which have appeared in the media derogating Landis' role with the wrestling team.

l.      On information and belief, Mr. Bonomo has made other untrue statements to representatives of the media attempting to disparage Landis.

m.      Ms. Taylor has made statements that Landis will never participate in the wrestling program at Lock Haven because he caused "trouble" for the program.

65.     The acts of retaliation were undertaken by the Defendants at those points in time which would interfere with and/or prohibit Landis from participation in the wrestling program and the scholarship associated with it.

66.     Dr. Miller became aware of the acts of retaliation taken with respect to Landis by Ms. Taylor and Mr. Bonomo no later than September 2008.

67.     Despite Dr. Miller's knowledge of the acts of retaliation taken by Ms. Taylor and Mr. Bonomo against Landis, Dr. Miller failed to take steps to end the retaliatory acts or to remedy the impact of the retaliation on Landis.

68.     As of the date of filing this Complaint, Landis continues to be retaliated against for raising questions related to the above-referenced NCAA violations.  This retaliation against Landis has continued as follows:

a.     On or about August 25, 2009, Landis contacted the Associate Head Coach at Lock Haven expressing his continuing desire to be a member of Lock Haven's men's wrestling team.

b.     In September 2009, Landis made efforts to rejoin the wrestling team by attending mandatory team meetings and collecting necessary team paperwork.

c.     During team meetings on September 3, 2009 and September 7, 2009, the Associate Head Coach agreed to provide Landis with extra time to review and submit his paperwork.  During the meetings, the Associate Head Coach also informed all potential members of the wrestling team that they could not participate in training or practices until the coach received signed paperwork.

d.     Despite being granted additional time to submit his team paperwork, on September 12, 2009, Landis was informed by the Associate Head Coach that he was no longer on the men's wrestling team because he had missed the deadline to submit team paperwork and had missed two team training sessions.

e.     Landis was told to "appeal" to Mr. Bonomo and, when he did appeal, was perfunctorily denied the opportunity to participate on the wrestling team.

f.      The denial of an opportunity to Landis to participate on the wrestling team was undertaken by Mr. Bonomo even though other members of the men's wrestling team have been permitted to participate despite media reports of serious allegations of improper conduct, including arrests for underage drinking and/or furnishing alcohol to minors.

69.     Dr. Miller had knowledge of the additional and continuing retaliatory acts against Landis no later than September 2009.

70.     Despite his knowledge of the additional and continuing retaliatory acts against Landis, Dr. Miller failed to take any steps to terminate the retaliatory acts or remedy their impact on Landis, as a consequence of which he acquiesced in those acts.

71.     As of the date of filing this Complaint, Landis has been denied the ability to participate in the wrestling program at Lock Haven, and has been denied an athletic scholarship in direct retaliation for the questions referenced above which have been raised relating to NCAA rule violations.

## Count I
## 42 U.S.C. § 1983
## First Amendment – Retaliation
## Plaintiff v. All Defendants

72.     The averments of the foregoing paragraphs are incorporated herein.

73.     At all times relevant hereto, Ms. Taylor, Mr. Bonomo and Dr. Miller acted under color of state law.

74.     Landis spoke on a matter of great public concern when he voiced his statements to Ms. Taylor, Mr. Bonomo and Provost Johnson with respect to violations of NCAA rules within the wrestling program at Lock Haven.

75.     Landis' speech was constitutionally protected.

76.     Ms. Taylor and Mr. Bonomo retaliated against Landis by attempting to force Landis to leave the wrestling program at Lock Haven voluntarily, by conducting an investigation which was essentially a cover-up of NCAA violations in the wrestling program at Lock Haven, by making difficult Landis' ability to renew his athletic scholarship for 2008-2009, by demeaning Landis in the eyes of his teammates, by removing Landis from the roster of team members at Lock Haven, by refusing to permit him to participate as a member of the wrestling team, and by making statements, including media statements by at least Mr. Bonomo, that Landis' removal from the team was for the good of the team. The retaliation by Ms. Taylor and Mr. Bonomo is continuing to the date of filing this Complaint.

77.     Dr. Miller was aware of and acquiesced in the acts of retaliation.

78.   Landis' constitutionally protected speech was a substantial and motivating factor in causing the retaliation against him.

79.   The actions taken by Ms. Taylor and Mr. Bonomo, and acquiesced in by Dr. Miller, were directed at Landis' constitutionally protected speech.

80.   The actions of Ms. Taylor and Mr. Bonomo, and acquiesced in by Dr. Miller, would effectively deter a person of ordinary firmness from exercising his or her constitutional First Amendment rights.

81.   The actions of Ms. Taylor and Mr. Bonomo, acquiesced in by Dr. Miller, were effectively calculated to deter Landis from raising issues about violations of NCAA rules in the wrestling program at Lock Haven.

82.   As a consequence of their unlawful, deliberate, intentional and malicious acts, Defendants, with deliberate and callous indifference and disregard for Landis' rights, have deprived Landis of his right to freedom of speech, in violation of the First and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

83.   As a consequence of the unlawful, deliberate, intentional and malicious acts of Defendants, jointly and severally, Landis has suffered irreparable harm.

84.   As a consequence of the unlawful, deliberate, intentional and malicious acts of Defendants, jointly and severally, Landis has suffered present and future financial harm.

WHEREFORE, Landis Wright seeks judgment in his favor and against Mr. Bonomo, Ms. Taylor, and Dr. Miller, jointly and severally, for compensatory damages, punitive damages, and an Order of this Court (1) declaring that Defendants' conduct violated the First Amendment; (2) enjoining Defendants from continuing any aspect of their retaliation, including enjoining Defendants, jointly and severally, from continuing to bar Landis from participating as a member of the wrestling team of Lock Haven; (3) awarding attorney's fees and costs of this action as provided at law, including 42 U.S.C. § 1988, and such other relief as the Court may deem just and equitable.

### Count II
### Negligent Supervision
### Plaintiff v. Miller and Taylor

85.   The averments of the foregoing paragraphs are incorporated herein.

86.   By their actions and violation of law, Ms. Taylor and Mr. Bonomo intentionally harmed Landis.

87.   The actions which potentially harmed Landis occurred while Ms. Taylor and Mr. Bonomo were employees of Lock Haven and further occurred on the property of Lock Haven.

88.   Dr. Miller knew, or should have known, that Ms. Taylor and Mr. Bonomo were capable of retaliation and in fact took actions of retaliation against Landis, jointly and severally.

89.   Dr. Miller failed to exercise ordinary care to prevent Ms. Taylor and Mr. Bonomo from harming Landis.

90.   Ms. Taylor failed to exercise ordinary care to prevent Mr. Bonomo from harming Landis.

91.   As a direct and proximate cause of the failure of Dr. Miller and Ms. Taylor to exercise ordinary care, Landis has been harmed.

**WHEREFORE**, Landis Wright seeks judgment in his favor and against Dr. Miller and Ms. Taylor, jointly and severally, for compensatory damages, punitive damages, and an Order of this Court (1) declaring that Defendants' conduct constituted negligent supervision; (2) enjoining Defendants from any continuing aspect of the retaliation over which they negligently supervised; (3) awarding attorney's fees, costs, interest and such other relief as the Court may deem just and appropriate.

## **JURY DEMAND**

Pursuant to Article VII of the U.S. Constitution and Fed. R. Civ. P. 38(b),

Plaintiff demands a trial by jury of all issues triable of right by a jury.


BUCHANAN INGERSOLL & ROONEY PC


By:___ /s/ Jack M. Stover_____
Jack M. Stover
I.D. #18051
One Market Square
213 Market Street, 3rd Flr.
Harrisburg, PA  17101
(717) 237-4800

DATE:  October 30, 2009